**Opinion issued June 24, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00453-CV**

———————————

**MICHAEL B. BELL AND COMMUNITY RV INVESTMENTS, LLC,**
**Appellants**

**V.**

**BAY AREA RV PARKS, L.L.C. F/K/A BAY AREA UTILITIES, L.L.C.,**
**CHARLES E. SIMMONS, CHARLES STEVEN SIMMONS, CHARLES**
**STEVEN SIMMONS AS TRUSTEE OF THE H.S. SIMMONS TRUST,**
**JUDSTON F. WELLING, JONATHAN D. GIBBS, AND WGB RV PARKS**
**LLC, Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-32654**

---

**O P I N I O N**

This multi-party business dispute has been here before. Two years ago, we

adjudicated one facet of the case. *See Bay Area RV Parks, L.L.C. v. WGB RV Parks,*

*LLC*, No. 01-21-00085-CV, 2023 WL 2248738 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.). In this related branch of the litigation, the trial court submitted a jury charge with 20 questions, asking about matters such as breach of contract, fraud, conversion, and attorney's fees. The questions on appeal are just as varied. Is there evidence of ratification? Are the trial court's declarations appropriate? Does the tort of conversion make any sense when extended to someone's intangible membership interest in an LLC?

The case involves a dispute among members of a limited liability company relating to the removal of the manager of the company and to disposition of one of the member's membership interest. After the working relationship between the four members of appellee WGB RV Parks, LLC deteriorated, appellants Michael B. Bell and Community RV Investments, LLC and appellees Bay Area RV Parks, L.L.C., Charles E. Simmons, Charles Steven Simmons, individually and as trustee of the H.S. Simmons Trust, Judston F. Welling, and Jonathan Gibbs asserted various claims against each other, including claims for breach of the Company Agreement, declaratory relief, fraud, and conversion.

Following a jury trial and a verdict that included some favorable findings for every party, the trial court granted a motion for judgment notwithstanding the verdict filed by Bay Area, Charles E. Simmons, Charles Steven Simmons, and the Trust, and it ordered that Bell and Community take nothing on their claims. The court then

signed a final judgment granting declaratory relief against Community and in favor of Welling and Gibbs, and it ordered Community to pay attorney's fees to Welling and Gibbs in the amounts found by the jury.

In four issues on appeal, Bell and Community argue that the trial court erred by (1) granting judgment notwithstanding the verdict because Bay Area did not establish its defense of ratification as a matter of law; (2) failing to render judgment that Bay Area, Welling, Gibbs, and WGB failed to comply with the Company Agreement, causing damages to Community; (3) making five declarations in its final judgment, awarding attorney's fees to Welling and Gibbs, and failing to condition the award of appellate attorney's fees on an unsuccessful appeal; and (4) granting a directed verdict on Bell and Community's conversion claim because Texas law supports a cause of action that a membership interest in an LLC can be converted.

We reverse in part, modify the trial court's judgment in part, and affirm the remainder of the trial court's judgment.

## Background

### A.     Membership of WGB RV Parks

In 2009, three real estate investors decided to form a company to own and manage RV parks in the greater Houston area. Judston Welling, Jonathan Gibbs, and Michael Bell—through his company Heights Equity Funding Corp.—formed WGB RV Parks, LLC (WGB or the Company) and signed a company agreement. Welling,

3

Gibbs, and Heights Equity each owned a one-third membership interest in WGB. Welling and Gibbs both made capital contributions to provide the initial funding for the Company. Bell, on the other hand, contributed "sweat equity" and acted as the manager of the Company.

Shortly after formation, WGB purchased two RV parks located in Hitchcock, southeast of Houston: Lazy Days and Little Thicket. Both RV parks were in "very rough shape" and required significant improvements. The following year, WGB purchased Park on the Lake, an RV park near Lake Conroe. Bell's responsibilities as manager of WGB included supervising the on-site managers of each RV park, the bookkeeper for the Company, and several bank accounts relating to each park and the Company itself. Bell frequently provided financial reports to Welling and Gibbs.

In 2017, Charles "Chuck" Simmons decided to invest in WGB through Bay Area, a company that he owned with his son, Charles Steven "Steve" Simmons. Bay Area agreed to contribute $500,000 to be used for the expansion of Lazy Days and Little Thicket in exchange for a 25% membership interest in WGB. The existing members of WGB—Welling, Gibbs, and Heights Equity—all agreed to the change in membership and the corresponding reduction of their membership interests from one-third to one-quarter interest each. In September 2017, Welling, Gibbs, Heights Equity, and Bay Area all signed an amended company agreement governing the

affairs of WGB (the Company Agreement). This is the primary contractual document at issue in this appeal.

Prior to Bay Area's admission to WGB, the Company had made regular distributions to its members, with Welling, Gibbs, and Heights Equity all receiving equal distributions. After Bay Area became a member of WGB, Chuck Simmons expressed concern over the Company's finances. WGB's cash reserves were "running very low," the members wanted to make improvements to the RV parks, and they knew that WGB would need to spend a significant amount at Park on the Lake for a sewer hook-up through a municipal utility district. All members therefore agreed that WGB would withhold making distributions for about a year to build up the cash reserves.

**B.   Removal of Bell as Manager of WGB**

Bell did not receive a management fee during the first eight years that he served as WGB's manager. However, when the members were negotiating the amendments to the Company Agreement around the time of Bay Area's admission, Bell requested that the agreement include an amendment authorizing payment of a management fee to the manager. The other members agreed, and the Company Agreement included the following definition:

> 29.   "Management Fee" means an amount paid to the Manager on a monthly basis equal to five percent of the gross proceeds received by the Company, excluding electricity, cable television reimbursements and coin operated washers and dryers. This payment will only be made

5

if monthly distributions in their entirety are made to each Member of the company prior. In the event the "Management Fee" is not made on any given month, the outstanding sum will be accrued and paid when financial circumstances permit.

Bell believed that he was entitled to receive a monthly management fee beginning in September 2017, the month the members adopted the amendments to the Company Agreement, despite the members' agreement to withhold distributions for the foreseeable future to increase the cash reserve.

In November 2017, Bell began transferring funds from WGB's bank account to entities that he controlled. The financial reports—which Bell provided to the other members—reflected these payments. For example, the Company's November 2017 General Ledger showed that on November 17, 2017, WGB made three payments totaling $4,200 out of its operating account to "HHH," which Bell agreed was one of his entities. The entry for each of these payments in the ledger included a notation stating, "Accrued Expenses: Accrued Management Fee: Draw against Accrued Management Fees." Bell characterized these payments as either payments for management fees that had accrued but had not yet been paid, or as "an advance of a management fee." He did not inform the other members before making these payments.

Bell continued making these payments into 2018. In April 2018, after Bell provided the monthly financial reports to Chuck Simmons, Simmons forwarded the reports to Welling and Gibbs. Simmons requested that they "review expenses"

because the Company "need[s] to get a handle on them." Welling obtained eighteen months of bank statements for WGB's bank accounts and started reviewing the Company's expenditures. In doing so, Welling discovered "money going out to Mr. Bell and two of his companies" as well as "some checks that just didn't make any sense."

Welling reported his findings to Chuck Simmons and Gibbs. They "met and decided that [they] needed to make a change and remove [Bell] as manager." They also started making plans to hire a management company to take over management of the RV parks from Bell.

The members requested that Bell join them for an in-person meeting on May 15, 2018. Although the members planned to inform Bell that they had voted to remove him as manager, they did not provide him advance notice of what they intended to discuss. Before Bell arrived at the meeting, Welling, Gibbs, and Chuck Simmons on behalf of Bay Area all signed an "Action By Written Consent of the Members of WGB RV Parks, LLC" removing Bell as WGB's manager. At the meeting, the members informed Bell of their vote. Bell testified that he was shocked. Welling testified that Bell did not ask for the rationale behind the vote, but he instead told the other members that he understood and "was ready to discuss how [they] could do a smooth transition" to Welling taking over as managing member and the involvement of a management company.

Bell's tenure as managing member ended on June 30, 2018. At some point around this time, the other members of WGB learned that Bell's company Heights Equity had become Community RV Investments, L.L.C.[1] This concerned the members because the Company Agreement contained provisions relating to the transfer of membership interests that were designed to protect the rights of the other existing members of the Company. Welling, Gibbs, and Bay Area gave Bell notice of their intent to exercise their rights under the Company Agreement to acquire Heights Equity's interest in WGB "on the same or similar terms as those offered by" Community.

Several weeks later, Bell responded and stated that he did not believe the buy-out provisions of the Company Agreement had been triggered because although the transaction involving Heights Equity and Community "was structured as a merger," the ownership of the entities did not change, so "the net [e]ffect was merely a change of name." Bell included an analysis that he had prepared several months earlier at Chuck Simmons' behest reflecting that the value of a membership interest in WGB was approximately $650,000. He stated, "If you would like to purchase my interest

---

[1]     In January 2018, Bell filed a Certificate of Merger with the Texas Secretary of State. This document reflected that Heights Equity would merge with Heights Heritage Homes, Inc.—one of the entities that had received payments from WGB's bank accounts beginning in November 2017—and the surviving entity would be known as Community RV Investments, LLC.

based on this analysis, I am more than willing to move forward <u>voluntarily</u> to allow you to purchase my interest."

Bell also informed the other WGB members that while members constituting a supermajority of the membership interests—such as Welling, Gibbs, and Bay Area—could take certain actions, they had to do so in accordance with the Company Agreement's procedures, and they had not done so with respect to removing him as WGB's manager. The members had not "held a meeting" nor had they "produced any documentation to show any amendment to the Company Agreement or to confirm any actions [they] may have taken." Bell demanded that the other members "follow the necessary protocols in taking the actions that you seem to be committed [to taking]. It is imperative that you follow the necessary formalities."

## C.    Negotiations to Sell Community's Interest in WGB

In December 2018, Welling sent Bell a letter demanding that he turn over all books and records of WGB and provide "documentation for any unauthorized transfers and distributions." Welling also proposed that WGB and its members release all claims against Bell "in exchange for a mutual release and the relinquishment by [Bell] and [his] affiliates of any membership interest [he] may have in the Company."

In response, Bell suggested that "furnishing those books and records at this time would be counter-productive to reaching a resolution," and he instead proposed

several options for a path forward. One of these options involved WGB or the other members buying out Community's interest in WGB for $300,000.

Around this same time, Bell and Chuck Simmons began negotiating a side agreement for Bay Area to purchase Community's membership interest in WGB. These negotiations culminated in Bell and Chuck Simmons—on behalf of their respective entities, Community and Bay Area—signing a Membership Interest Purchase and Sale Agreement (PSA), to be effective on February 1, 2019. Under the PSA, Community agreed to sell its membership interest in WGB to Bay Area for a cash payment of $285,000, a release, and a promise to indemnify. Bell and Chuck Simmons discussed the possibility of Bay Area agreeing to indemnify Bell against any claims arising out of the sale of Community's membership interest in WGB, but the parties did not sign such an agreement.

Several developments occurred over the course of the next month that affected the planned sale of Community's interest in WGB to Bay Area.

Bell notified Welling and Gibbs of the proposed transaction between Community and Bay Area, and he sent them the signed PSA and a draft assignment of Community's interest in WGB to Bay Area, signed by both Bell and Chuck Simmons. Chuck Simmons emailed Welling and Gibbs and offered, upon closing of the PSA, to transfer one-third of Community's interest in WGB to both Welling and Gibbs. Welling, then the manager of WGB, emailed the other members and stated

his intent to exercise WGB's right of first refusal—provided for in the Company Agreement—to purchase Community's interest in WGB on the same terms as the PSA. Alternatively, if the members did not agree to allow WGB to exercise its right of first refusal, Welling proposed that the individual members of the Company exercise their rights to purchase Community's interest in WGB on a pro rata basis. Although Welling and Gibbs consented to both options, no other member did.

Also around this time, WGB entered into a contract to sell the Lazy Days and Little Thicket RV parks. The closing of this sale was scheduled for late February 2019. WGB did not reach an agreement at that time to sell the remaining RV park, Park on the Lake.

On February 21, 2019, Bell met with Chuck Simmons. He then emailed a memo to his attorney and Simmons "to document our understanding." Bell stated:

> Simmons is thinking that Welling and Gibbs might become litigious as a stalling tactic in fighting Simmon[s'] purchase of the Bell interest, complicating everything.
>
> He [Simmons] says at this point he's ok with keeping a 25% interest through the final sale of Park On The Lake, the final property to be sold, about 6 months (?) from now and be done with it. The final sales proceeds will be split 4 ways.
>
> So here are the results of our conversation:
>
> 1. Simmons will personally and confidentially pay Bell $285,000 now, as a "prepayment" against the final distribution on the final sale, estimated to be about $500,000 to each of the 4 participants.
>
> Currently with receiving the $285,000 from Simmons, Bell will withdraw his sale arrangement from WGB.

At the conclusion of the final sale of the WGB properties, Bell will receive his 1/4 share of the proceeds, an estimated $500,000, and at that time will repay Simmons the "prepayment" of the $285,000. Simmons is not requesting any compensation or premium for this generous arrangement to Bell.

Appropriate documents will be drafted to document this personal and confidential arrangement.

2. Bell, without prompting by Simmons and in recognition of the results created by Simmons for the benefit of all the partners, will give Simmons the right to exercise the purchase of the Bell interest for the $285,000 at any time until the final sale closing out the WGB company.

Assignment documents, undated but executed by Bell, will be provided to Simmons to be used, or not, at Simmons['] discretion, to exercise his purchase of the Bell interest.

As February 2019 went on, Bell started to regret the PSA. At the time he signed the PSA, the sale of Lazy Days and Little Thicket "had not progressed to the point where it had firmed up." Several weeks later, it became clear that this sale would close and that the purchase price for the two parks would be $2.7 million, a fourth of which would be around $600,000 or $700,000. Bell was no longer pleased with the $285,000 purchase price for Community's interest in WGB that he had agreed to in the PSA.

On February 26, 2019, Bell and Chuck Simmons, on behalf of their respective entities, signed a Mutual Termination of Membership Interest Purchase and Sale Agreement (the Termination Agreement). In this agreement, Community and Bay Area agreed to terminate the PSA as of that date. The Termination Agreement stated that "the rights, duties and obligations of Seller and Purchaser under the PSA are

hereby terminated and the PSA is terminated for all purposes and shall have no further force or effect." Bell sent the Termination Agreement to Welling and Gibbs on the same day he and Simmons signed it.

On the following day, Steve Simmons—unaware that Bell and Chuck Simmons had signed the Termination Agreement—prepared to participate in the sale of Community's interest to Bay Area.[2] Steve Simmons was the trustee of the Trust, a trust set up for the benefit of his minor son, and Steve and Chuck Simmons had planned to use funds from the Trust to purchase Community's membership interest in WGB. Steve Simmons obtained a cashier's check in the amount of $285,000 from the Trust's bank account. He had the bank make the check payable to the order of Michael Bell. On the line labeled "Remitter," he had the bank print "H.S. Simmons Trust." Directly below this line, he requested that the bank print "25% Interest RV Parks" because he believed the purpose of the check was to purchase Community's interest in WGB.

The sale of Lazy Days and Little Thicket closed on February 28, 2019. The following day—March 1, 2019—Bell, Chuck Simmons, and Steve Simmons all met

---

[2]  The Termination Agreement has three signature blocks: one for Michael Bell, as Manager of Community; a second for Chuck Simmons, as Manager of Bay Area; and a third for Steve Simmons, also as Manager of Bay Area. The signature block for Steve Simmons reflects a signature. Steve Simmons, however, testified that he did not know about the Termination Agreement and only learned of it "later." He testified that his father Chuck Simmons sometimes signs documents on his behalf because Steve lives in Austin, "so sometimes logistically that's a better plan."

13

at Moody Bank in Galveston, where WGB had its accounts and where Bell had a personal account. At this meeting, Steve Simmons gave the cashier's check for $285,000 to Bell, who immediately deposited the check into his personal account. Steve Simmons did not hear anyone suggest that this payment was actually a loan, nor did he intend to loan any money to Bell, whom he had just met at the closing of the two RV parks the day before.

Bell, on the other hand, testified that the $285,000 payment was a loan. According to Bell, Chuck Simmons—with Steve Simmons present—handed him the cashier's check and told him that Bell was to pay the loan back "out of the sale of Park on the Lakes several months later." Bell and Chuck Simmons did not discuss an interest rate or any loan terms beyond Simmons telling Bell, "Pay me back in a couple of months. We'll settle up then." Bell never returned the $285,000 to Chuck Simmons, Steve Simmons, or the Trust.

In addition to the cashier's check, another check changed hands between Bell and Chuck Simmons on March 1 at Moody Bank. Bell gave Chuck Simmons a check payable to Bay Area for $500,000 drawn on WGB's construction account as a return of Bay Area's initial capital contribution in WGB. Bell did this knowing that Welling

and Gibbs strongly disagreed that Bay Area was entitled to a return of its capital contribution at that time.[3]

**D.     Recognition of the Trust as the Owner of Community's Interest**

The return of Bay Area's $500,000 capital contribution placed WGB in dire financial straits, leading to a capital call later in March 2019. Each of the WGB members was asked to contribute $20,000. The Trust was not asked to contribute $20,000, nor did it. Community, on the other hand, was asked to contribute $20,000, and it did so on March 27, 2019.

Litigation over the $500,000 payment to Bay Area threatened to ensue in spring 2019. Bell and Chuck Simmons—on behalf of their respective entities— sought joint representation. Ultimately, Bay Area filed suit first, naming WGB, Welling, and Gibbs as defendants, and seeking a declaration that the profits from the sale of Lazy Days and Little Thicket should have been allocated to reduce Bay Area's capital account balance to $0. Bay Area's original petition included the

---

[3]     This payment of $500,000 to Bay Area became one of the areas of dispute in this litigation. Welling, Gibbs, Chuck Simmons, and Bay Area all brought claims for declaratory relief relating to whether Bay Area was entitled to a preferential return of its capital contribution following the sale of Lazy Days and Little Thicket. These declaratory claims were severed into a separate lawsuit and were the subject of a bench trial in October 2020. All four parties appealed from the trial court's judgment, and a panel of this Court issued an opinion resolving this portion of the dispute in February 2023. *See Bay Area RV Parks, L.L.C. v. WGB RV Parks, LLC*, No. 01-21-00085-CV, 2023 WL 2248738 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.). In the trial underlying the present appeal, Welling, Gibbs, Bay Area, and Chuck Simmons did not assert claims against each other.

15

following statement: "Community RV Investments, L.L.C. is a member of WGB RV Parks, L.L.C. Community RV Investments, L.L.C. does not oppose the relief sought by Plaintiff in this declaratory judgment action. Consequently, all members of this limited liability corporation, WGB RV Parks, L.L.C., are parties to this case or otherwise do not oppose the relief sought in this declaratory judgment action."

Over the next several months, Welling and Gibbs asserted several affirmative claims, including a claim against Bell for breach of fiduciary duty relating to his management of WGB. Bell asserted counterclaims against WGB and Welling relating to the Company's failure to pay him the management fee. Additionally, by September 2019, Bell and Chuck Simmons disagreed over the $285,000 payment, although they had not yet asserted claims against each other.

On August 28, 2020, Welling, Gibbs, and Chuck Simmons on behalf of Bay Area—a supermajority of the membership interests in WGB—signed a "Written Consent of Members Without a Meeting." This document recognized that Community held a 25% membership interest in WGB; that it offered its membership interest in WGB for $285,000; that it later agreed to sell its membership interest in WGB to the Trust for $285,000; that the Trust paid Community $285,000 via its member and manager Bell on February 27, 2019; and that Bell accepted and deposited the payment on March 1, 2019. The WGB members agreed to recognize the sale of Community's membership interest to the Trust under Article 6 of the

16

Company Agreement and to substitute the Trust as a member of WGB in place of Community.[4] The Trust accepted membership in WGB and agreed to be bound by the Company Agreement.

## E.    Procedural Background

### 1.    The claims asserted by the parties in their live pleadings

Except for WGB and Chuck Simmons, all parties involved in this litigation have asserted affirmative claims for relief. We summarize the claims brought by each party in their live pleading at the time of trial.

Bay Area brought a breach of contract claim against Bell and Community arising out of the purported transfer of Community's membership interest in WGB. It alleged that it and Bell signed the PSA to purchase Community's interest in WGB, and Bell received $285,000. The parties also signed the Termination Agreement. Bay Area alleged that Bell's failure to return the $285,000 payment constituted a total failure of consideration for the Termination Agreement. Therefore, the PSA still governed the relationship between Bay Area and Community, but Bell breached that agreement by not acknowledging the sale of Community's interest in WGB to Bay Area. Bay Area sought specific performance of the PSA. Steve Simmons,

---

[4]    The August 2020 "Written Consent of Members Without a Meeting" acknowledged that WGB's recognition of the sale was "without prejudice to any and all rights, claims, privileges, or causes of action that Judston F. Welling or Jonathan D. Gibbs have or may have under Article 6 of the Company Agreement . . . ."

individually and as trustee of the Trust, filed separate pleadings but asserted the same claim as Bay Area and sought the same affirmative relief.

Welling and Gibbs asserted a claim against Bell for breach of fiduciary duty based on his alleged misappropriation of WGB funds. They alleged that Bell caused financial injury to WGB by "taking a management fee in violation of the Company [A]greement, by exposing the Company to liability for legal claims through his gross mismanagement, by self-dealing, and by misallocating funds." They further alleged that Bell breached the provision in the Company Agreement requiring him to perform his duties as manager in good faith, in the best interests of WGB, and with ordinary care.

Welling and Gibbs also asserted claims for fraud and civil conspiracy against Bell, Community, Chuck and Steve Simmons, and Bay Area based on their attempts to transfer Community's interest in WGB. They alleged that Community and Bay Area signed the Termination Agreement but then proceeded with the transfer anyway to defeat Welling's and Gibbs' right of first refusal.

Welling and Gibbs further alleged that Community and Bay Area breached the Company Agreement by failing to give notice of Community's intent to transfer its interest in WGB to the Trust. They sought specific performance and a declaration that they were each entitled to "acquire at least one third, and up to half, of the interest Community RV agreed to be transferred to the H.S. Simmons Trust." They

18

further requested imposition of a constructive trust "on at least two thirds, and up to all, of Community RV's interest."

Bell sued Bay Area, Welling, Gibbs, and WGB for breach of contract, alleging that they breached portions of the Company Agreement relating to the removal of the manager and provisions relating to notice and meetings of members. As actual damages for his alleged wrongful termination as manager, Bell sought more than $150,000 in unpaid management fees.

In related claims, Community asserted conversion claims against all defendants (WGB, Welling, Gibbs, Bay Area, Chuck Simmons, Steve Simmons, and the Trust), and it alleged fraud against a subset of the defendants (Chuck Simmons, Steve Simmons, Bay Area, and the Trust). Community alleged that Chuck Simmons, Steve Simmons, the Trust, and Bay Area committed fraud through Chuck Simmons' alleged misrepresentation to Bell that the $285,000 cashier's check was a loan, when he actually planned to assert that this was payment to purchase Community's membership interest in WGB. Community alleged that all defendants converted its membership interest in WGB when they signed the August 2020 document recognizing the transfer of Community's interest in WGB to the Trust. Community further alleged that by recognizing this purported transfer, Bay Area, WGB, Welling, and Gibbs all breached provisions of the Company Agreement relating to disposition

19

of membership interests. Community sought exemplary damages against all defendants.

In prior pleadings, Bell and Community had sought several declarations, including declarations that (1) Bell did not sell Community's interest in WGB by cashing the $285,000 check; instead, he received a loan from Chuck Simmons and Community was still a member of WGB; and (2) the other members' action in removing Bell as manager of WGB was ineffective and Bell remained the manager. Bell and Community later omitted their claims for declaratory relief from an October 2021 amended pleading, and these claims were not raised in Bell and Community's live pleading filed in November 2021.

## 2. The jury trial

At trial, three fact witnesses testified: Steve Simmons, Bell, and Welling.[5] Bell had planned on calling an expert witness to testify concerning the valuation of a one-fourth membership interest in WGB, but the parties reached an agreement and stipulated that the value of a one-fourth membership interest in WGB as of August 28, 2020, was $925,000.

The witnesses' testimony concentrated on several different topics that were in dispute. These topics included the propriety of Bell's payment of accrued

---

[5] Counsel for Welling and Gibbs and counsel for the Bay Area parties—Bay Area, Chuck Simmons, Steve Simmons, and the Trust—also testified concerning their attorney's fees.

management fees to himself even though WGB's members had agreed to suspend distributions; Bay Area's, Welling's, and Gibbs' compliance with the Company Agreement when they notified Bell that he was being removed as manager of WGB; negotiations concerning the transfer of Community's interest in WGB to Bay Area; Bell's knowledge of the Trust prior to his acceptance of the $285,000 cashier's check; whether the cashier's check was payment for the purchase of Community's interest in WGB or a loan from Chuck Simmons to Bell; the continued recognition of Community as a member of WGB by the other members after the purported sale of Community's interest in WGB; and the other members' compliance with the Company Agreement in recognizing the transfer of Community's interest in WGB to the Trust.

Following the close of evidence, all parties moved for directed verdict on at least one issue in the case. The trial court granted only one motion for directed verdict: Welling and Gibbs' motion for directed verdict on Bell and Community's conversion claim on the basis that Texas law does not recognize a cause of action for conversion of an LLC membership interest.

The charge of the court presented the jury with twenty questions, many of which were conditioned upon affirmative answers to other questions, and several of which the jury did not answer due to how it had responded to prior questions. The jury found that Community and Bay Area did not enter into an enforceable

21

agreement for Community to sell its membership interest in WGB "under the terms of" the PSA.[6] The jury also found that Community did not agree to sell its interest in WGB to the Trust.[7]

The jury found that Community failed to comply with Section 6.2 of the Company Agreement, which required it to give notice of intent to transfer its membership interest in WGB. It further found that Community's failure was not excused.

With respect to the removal of Bell as WGB's manager, the jury was asked whether Welling, Gibbs, Bay Area, and WGB failed to comply with the Company Agreement. The jury answered "no" with respect to each of these four parties, and as a result, the jury did not reach the following two questions relating to whether the parties' failure to comply was excused and the sum of money that would compensate Bell for the parties' failure to comply.

---

[6] As a result of this negative answer, the jury did not answer two additional questions: (1) whether Community failed to comply with the agreement, if any, with Bay Area; and (2) whether Community's failure to comply was excused.

[7] The following question in the charge—whether Community failed to comply with the agreement, if any, with the Trust—was not conditioned on a "yes" answer to whether Community agreed to sell its interest in WGB to the Trust. The jury answered "no" to this question, and it did not answer the next question, which asked whether Community's failure to comply was excused. The jury also did not answer the question asking it to determine the reasonable fee for Bay Area and the Trust's attorney.

22

The next set of questions concerned the sale of Community's interest in WGB to the Trust. The jury found that Welling, Gibbs, Bay Area, and WGB all failed to comply with Section 6.8 of the Company Agreement by recognizing the sale of Community's interest in WGB. When asked whether the parties' failure to comply was excused, the jury answered "yes" for Welling, Gibbs, and WGB, but "no" for Bay Area. The charge then asked the jury to determine the sum of money that would reasonably compensate Community for its damages resulting from the failure to comply and it presented the jury with two elements of damages: (1) the fair market value of a 25% membership interest in WGB as of August 28, 2020, and (2) the value of the $20,000 capital contribution. The jury answered $925,000 with respect to the first element, and $0 with respect to the second.

The charge asked the jury whether Bay Area, Chuck Simmons, Steve Simmons individually, and Steve Simmons as trustee of the Trust committed fraud against Community. The jury answered "no" for all four parties. As a result, the jury did not answer three questions relating to Community's actual and exemplary damages resulting from such fraud.

Finally, the charge asked the jury to determine a reasonable fee for the necessary services of Welling and Gibbs' attorney. The jury awarded Welling and Gibbs $165,555 in trial-level attorney's fees and a total of $32,500 in appellate attorney's fees.

23

### 3.    The post-trial motions and rulings

All parties filed post-trial motions, including motions for entry of judgment, motions to disregard certain jury findings, and motions for judgment notwithstanding the verdict. Two of these motions are of particular relevance to this appeal.

Welling and Gibbs moved for entry of judgment.[8] They argued that evidence supported the jury's answers that (1) Community failed to comply with Section 6.2 of the Company Agreement relating to notice of intent to transfer its membership interest in WGB, and (2) the failure of Welling, Gibbs, and WGB to comply with Section 6.8 of the Company Agreement by recognizing the sale of Community's interest was excused. Welling, Gibbs, and WGB argued that Community's conduct "created substantial uncertainty regarding ownership in WGB and the parties' rights and obligations under the Company Agreement," and they requested that the trial court issue five declarations to resolve this uncertainty, including declarations that:

- Community breached Section 6.2 of the Company Agreement;
- Community waived its right to rescind or void the transfer of its interest in WGB to the Trust;
- Community's interest in WGB was transferred to the Trust effective August 28, 2020;
- the Company Agreement gave Welling and Gibbs the right to participate in the transfer on a pro rata basis; and
- Community has not had an interest in WGB after August 28, 2020.

---

[8]    WGB later joined Welling and Gibbs' motion for entry of judgment.

24

Community responded and disagreed that declaratory relief was appropriate.

Bay Area, Chuck Simmons, and Steve Simmons—individually and as trustee of the Trust—moved for judgment notwithstanding the verdict, arguing that they had established the defense of ratification as a matter of law and therefore Bell and Community should take nothing on their claims. They argued that by accepting the cashier's check for $285,000, Bell ratified the PSA, effectively selling and transferring Community's membership interest in WGB. The trial court granted this motion and ordered that Bell and Community take nothing.

In its final judgment, the trial court issued the five declarations that Welling and Gibbs had requested in their motion for entry of judgment. The court then determined that it was equitable and just to award reasonable and necessary attorney's fees against Community to Welling and Gibbs, and it awarded the amounts found by the jury. The court did not condition the award of appellate attorney's fees on an unsuccessful appeal.

This appeal by Bell and Community followed.

## Ratification

In their first issue, Bell and Community argue that the trial court erred by granting Bay Area, Chuck Simmons, and Steve Simmons' motion for judgment notwithstanding the verdict on their defense of ratification. Bell and Community

25

argue that the evidence was conflicting on this defense, and therefore ratification was not established as matter of law.

## A.     Standard of Review

Generally, the trial court's judgment must conform to the pleadings, the nature of the case proved, and the verdict, if any. TEX. R. CIV. P. 301. However, a trial court may render judgment notwithstanding the verdict "if a directed verdict would have been proper." *Id.*

We review a trial court's grant of a judgment notwithstanding the verdict under a no-evidence standard, examining whether any evidence supports the findings by the jury. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). No evidence exists to support findings when there is: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). More than a scintilla of evidence exists when the evidence supporting the finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)).

When determining whether any evidence supports a judgment, we are limited to reviewing only the evidence that tends to support the jury's verdict. *Id.* (quotations omitted). We must disregard all evidence to the contrary. *Id.* (quotations omitted). We view the evidence and possible inferences from the evidence in the light most favorable to the verdict. *Id.* If more than a scintilla of evidence exists to support the verdict, it must be upheld. *Id.*; *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam) ("If more than a scintilla of evidence supports the jury's findings, the jury's verdict and not the trial court's judgment must be upheld.").

## B.    Governing Law

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) (quotations omitted); *Mission Petroleum Carriers, Inc. v. Kelley*, 449 S.W.3d 550, 553 (Tex. App.—Houston [14th Dist.] 2014, no pet.). It is an agreement—either express or implied through a course of conduct—"by one to be bound by the act of another performed for him." *BPX Operating*, 629 S.W.3d at 196 (quotations omitted). Ratification "extends to the entire transaction." *Id.* (quotations omitted). That is, a party cannot ratify the parts of the transaction that are beneficial and disavow those that are detrimental. *Id.* (quotations omitted); *Kelley*, 449 S.W.3d

at 553–54 ("A party cannot avoid an agreement by claiming there was no intent to ratify after he has accepted the benefits of the agreement.").

The inquiry focuses on the actions taken by the party seeking to avoid a contract once that party becomes fully aware that his prior act did not legally bind him. *Kelley*, 449 S.W.3d at 553. Once a party ratifies a contract, "he may not later withdraw his ratification and seek to avoid the contract." *Id.*

Ratification—like contract formation generally—is a matter of intent. *BPX Operating*, 629 S.W.3d at 196. A party's subjective state of mind is not relevant to a claim of implied ratification. *Id.* at 197. Instead, we look to objective evidence of intent, such as the party's conduct. *Id.* We must examine the totality of the circumstances, and we must not narrowly focus on one fact to the exclusion of all others. *Id.* at 197, 200. The party seeking to establish implied ratification or ratification by conduct "must point to words or actions that clearly evidence an intention to ratify." *Id.* at 197–98 (quotations omitted). A court may determine ratification as a matter of law if the evidence is not controverted or is incontrovertible. *Kelley*, 449 S.W.3d at 554; *see also BPX Operating*, 629 S.W.3d at 196 (noting that courts often treat ratification as mixed question of law and fact, but it may be determined as matter of law when facts are uncontroverted).

28

**C.      Whether Bay Area, Chuck Simmons, and Steve Simmons Established Ratification as a Matter of Law**

At trial, the jury found that Community and Bay Area had not entered into an enforceable agreement for Community to sell its membership interest in WGB under the terms of the PSA. The jury also found that Bay Area—along with Welling, Gibbs, and WGB—failed to comply with Section 6.8 of the Company Agreement by recognizing the sale of Community's interest in WGB, and that Bay Area's failure to comply was not excused. The jury awarded Community $925,000 in damages—representing the stipulated fair market value of a 25% membership interest in WGB as of August 28, 2020—as a result of Bay Area's unexcused failure to comply.

Following trial, Bay Area, Chuck Simmons, and Steve Simmons moved for judgment notwithstanding the verdict, arguing that Community and Bell should take nothing on their claims because the evidence conclusively established that Bell had ratified the PSA, and thus agreed to sell Community's interest in WGB, by accepting and depositing the $285,000 cashier's check. The trial court granted this motion and ordered that Bell and Community take nothing on their claims.

The jury charge did not ask the jury to make any findings on ratification. On appeal, Bay Area, Chuck Simmons, and Steve Simmons focus on six facts in arguing that they conclusively established ratification, eliminating the need for a jury question on this matter:

- Bell intended to sell Community's 25% interest in WGB to Bay Area for $285,000, he had many conversations with Chuck Simmons about the proposed sale, and he was "perfectly comfortable" signing the PSA;

- Bell considered the PSA to be a binding contract for the sale of Community's 25% interest in WGB to Bay Area for $285,000;

- Bell had complete authority to agree to the PSA on behalf of Community;

- No one coerced Bell into the sale of Community's 25% interest in WGB;

- No one defrauded Bell as part of the sale; and

- Bell cashed the $285,000 check and never returned the funds.

They argue that this evidence is undisputed, and therefore conclusive on the issue of ratification.

Community and Bell, on the other hand, argue that the evidence was conflicting, thus raising a fact issue on ratification that precludes a judgment notwithstanding the verdict. They point to several pieces of evidence, including: (1) the Termination Agreement; (2) the August 2020 document in which Bay Area— along with the other members of WGB—claimed that Community had agreed to sell its interest in WGB to the Trust, not Bay Area; (3) Bell's testimony that the $285,000 check was not related to the PSA but was instead a loan; and (4) subsequent conduct in which Bay Area and Chuck Simmons acknowledged that Community remained a member of WGB after Bell's acceptance of the check.

After Community and Bay Area signed the PSA, Welling and Gibbs objected to the potential sale of Community's interest in WGB. Welling proposed that instead

30

of Community selling its interest to Bay Area, either WGB exercise its right of first refusal or all members of WGB be given the opportunity to purchase Community's interest on a pro rata basis. Although Welling and Gibbs agreed that either of these options would be satisfactory, Bell and Chuck Simmons did not.

One day after Welling and Gibbs indicated their consent to Welling's plan, Bell emailed his attorney and Chuck Simmons to memorialize an "understanding" Bell had reached with Simmons. According to this understanding, Chuck Simmons agreed to pay Bell $285,000 "as a 'prepayment' against the final distribution on the final sale [of Park on the Lake], estimated to be about $500,000 to each of the [four members]." Bell agreed to "withdraw his sale arrangement from WGB." They also agreed that upon the sale of Park on the Lake, Bell would receive a one-fourth share of the proceeds "and at that time w[ould] repay Simmons the 'prepayment' of the $285,000." Bell also agreed to give Simmons "the right to exercise the purchase of the Bell interest for the $285,000 at any time until the final sale closing out the WGB company." He further agreed to provide executed assignment documents to Simmons "to be used, or not, at Simmons['] discretion, to exercise his purchase of the Bell interest."

Five days after Bell sent this email, he and Chuck Simmons—on behalf of Community and Bay Area—executed the Termination Agreement. This agreement recited that Community and Bay Area had entered into the PSA on February 1, 2019,

31

but the parties had agreed to terminate the PSA. Community and Bay Area agreed that their rights, duties, and obligations under the PSA "are hereby terminated and the PSA is terminated for all purposes and shall have no further force or effect."

Three days after the Termination Agreement was executed, Bell met Chuck and Steve Simmons at Moody Bank. Bell and Steve Simmons provided conflicting interpretations of what occurred at this meeting. While both agreed that Bell received a cashier's check for $285,000 made out to him personally, which he immediately deposited, they disagreed over what this payment represented. To Steve Simmons, the cashier's check represented payment for Community's 25% membership interest in WGB, which is why he asked the issuing bank to put in the remitter line: "H.S. Simmons Trust" and "25% Interest RV Parks."

To Bell, on the other hand, the $285,000 cashier's check represented a loan from Chuck Simmons. Bell testified that when the check was handed to him, Chuck Simmons told him that the $285,000 was a loan to be repaid by Bell out of the proceeds of the sale of Park on the Lake. They did not discuss loan terms such as an interest rate; instead, Chuck Simmons said, "Pay me back in a couple of months. We'll settle up then." Steve Simmons testified that he did not hear any mention of a loan, and neither he nor Chuck Simmons were in the practice of loaning funds to anyone.

Bell admitted that he has not repaid the $285,000 to Chuck Simmons, Steve Simmons, or the Trust. At the time of trial, WGB had not sold Park on the Lake.

In the weeks following Bell's receipt of the check, WGB issued a capital call. Community participated in response and contributed $20,000. The Trust was not asked to participate and did not make a capital contribution.

The trial record includes evidence that Bell negotiated the PSA on behalf of Community, and that under the PSA, he intended to sell Community's interest in WGB to Bay Area for $285,000. Weeks later, Bell and Chuck Simmons agreed to terminate the PSA. Several days after that, Bell accepted a check from either Chuck or Steve Simmons in the amount of $285,000—the original purchase price stated in the PSA—and he has not returned those funds. Even if, as Bay Area contends, this evidence supports the position that despite terminating the PSA, Bell later ratified that agreement by accepting the $285,000 check as payment for Community's membership interest in WGB, there is also evidence to the contrary.[9]

---

[9] Under the PSA, Community agreed to sell its interest in WGB to Bay Area. Bay Area argues that after execution of the Termination Agreement, which in effect expressly terminated the PSA, Bell ratified the PSA by accepting and depositing the cashier's check for $285,000. Bay Area has cited no authority to support its position that a party to an agreement can ratify the agreement after it is expressly terminated by all parties. Nor has Bay Area cited any authority supporting its position that Community's later purported agreement to sell its interest in WGB to the Trust by accepting the cashier's check can serve to ratify Community's earlier agreement under the PSA to sell its interest to Bay Area—a different purchaser. In any event, even if ratification could be established under these circumstances, as we conclude below, fact issues existed precluding the trial court's entry of judgment notwithstanding the verdict on the issue of ratification.

The trial record also includes evidence that in the face of Welling's and Gibbs' opposition to the proposed sale of Community's interest in WGB to Bay Area, Bell and Chuck Simmons reached a slightly different agreement in which Bell would withdraw the PSA, Simmons would pay Bell $285,000 as a "prepayment," and then Bell would repay this amount upon the sale of WGB's final property and distribution of the proceeds to the members. There is also evidence supporting Bell and Community's position that while the PSA contemplated a sale transaction between Community and Bay Area, the transaction contemplated under the cashier's check was between Bell and Chuck Simmons or Bell and the Trust. This evidence supports Bell and Community's position that rather than ratifying the parties' agreement under the PSA, Bell and Chuck Simmons had a different arrangement in which the $285,000 payment was more akin to a loan, rather than the purchase price for Community's interest in WGB.

In light of this conflicting evidence, we cannot conclude that Bay Area, Chuck Simmons, and Steve Simmons established their ratification defense as a matter of law. *See Kelley*, 449 S.W.3d at 554 (stating that court may determine ratification as matter of law when evidence is not controverted or is incontrovertible). Far from "clearly evidenc[ing] an intention to ratify," an examination of the totality of the circumstances instead demonstrates that a fact issue exists on whether Bell—on behalf of Community—impliedly ratified the PSA by accepting the $285,000

34

cashier's check from Chuck or Steve Simmons. *See BPX Operating*, 629 S.W.3d at 197–98. Resolving this fact issue was within the province of the jury, not the trial court on a motion for judgment notwithstanding the verdict. Because some evidence in the record supports the jury's verdict, we conclude that the trial court erred when it granted judgment notwithstanding the verdict based on ratification. *See Gharda USA*, 464 S.W.3d at 347.

We sustain Bell and Community's first issue.

## Breach of Company Agreement

In their second issue, Bell and Community argue that the trial court erred by not entering judgment against Bay Area, Welling, Gibbs, and WGB based on the jury's findings that each of those parties breached the Company Agreement.

## A. The Relevant Provision in the Company Agreement and the Jury's Findings

Article 6 of the Company Agreement broadly governs the disposition of WGB membership interests. It includes a provision granting a right of first refusal to WGB and its members upon another member's intent to transfer its membership interest. Section 6.2—entitled "Notice of Intent to Transfer"—requires members to provide notice of their intent to transfer their membership interest in WGB: "Before transferring a Membership Interest, a Member shall first give to the Manager and to all other Members notice of the intent to transfer. Any notice of intent to transfer

must include a copy of any bona fide written offer to purchase the Membership Interest that the Member has received."

Section 6.8—entitled "Assignees"—provides as follows:

(a)     The Company shall not recognize for any purpose any purported Disposition of Membership Interest unless the provisions of this Article 6 have been satisfied . . . and there is filed with the Company a written notification of such Disposition, in form satisfactory to the Super Majority, executed by both the seller, assignor or transferor and the purchaser, assignee or transferee and such notification (1) contains the acceptance by the purchaser, assignee or transferee of and agreement to be bound by all the terms and provisions of this Agreement . . . . Any Disposition of Membership Interest shall be recognized by the Company as effective on the date of such notification if the date of such notification is within fifteen (15) days of the date on which such notification is filed with the Company, and otherwise shall be recognized as effective on the date such notification is filed with the Company.

(b)     Any Member who Disposes of all of its Membership Interest in the Company shall cease to be a Member, except that, unless and until a substituted Member has been admitted into the Company, such assigning Member shall retain the statutory rights of the assignor of a member's interest under the Company Law.

At trial, Bell and Community argued that the other members of WGB and WGB itself breached Section 6.8 by improperly recognizing in their August 2020 written agreement that Community had sold its 25% membership interest in WGB to the Trust for $285,000. Question 13 of the jury charge asked whether Welling, Gibbs, Bay Area, and WGB failed to comply with Section 6.8 in recognizing the

sale of Community's membership interest. The jury answered "yes" with respect to all four parties.

Question 14 then asked whether the parties' failure to comply with Section 6.8 was excused. The question contained the following instruction on the defenses of waiver, equitable estoppel, and accord and satisfaction:

> Failure to comply by a party is excused if compliance is waived by Community RV Investments, L.L.C.
>
> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.
>
> Failure to comply by a party is excused if the following circumstances occurred:
>
> 1. Community RV Investments, L.L.C.
>
>    a. by words or conduct made a false representation or concealed material facts, and
>
>    b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and
>
>    c. with the intention that the other party would rely on the false representation or concealment in acting or deciding not to act; and
>
> 2. The other party
>
>    a. did not know and had no means of knowing the real facts and
>
>    b. relied to his or its detriment on the false representation or concealment of material facts.
>
> Failure to comply with an agreement by a party is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement.

> Each manager of a limited liability company is an agent of the company for purposes of carrying out the company's business. An act committed by a manager of a limited liability company in its capacity as manager of the company binds the company. An act committed by a manager of a limited liability company in its capacity as an individual does not bind the company.

The jury answered "yes" for Welling, Gibbs, and WGB, concluding that their failure to comply with Section 6.8 was excused, but it answered "no" for Bay Area. In Question 15, the jury found that the amount of money that would compensate Community for its damages resulting from the failure to comply with Section 6.8 was $925,000, representing the fair market value of a 25% membership interest in WGB as of August 28, 2020.

## B.    Sufficiency of Evidence that Bay Area Breached Section 6.8

When asked whether Bay Area's failure to comply with Section 6.8 was excused, the jury answered "no" and it awarded damages for the failure to comply. However, the trial court granted Bay Area's motion for judgment notwithstanding the verdict based on ratification, effectively disregarding the jury's answers to Questions 13, 14, and 15 with respect to Bay Area.

We have held that the trial court erred by granting Bay Area's motion for judgment notwithstanding the verdict because a fact issue existed on ratification. On appeal, although Bay Area has argued that the trial court properly granted judgment notwithstanding the verdict because it conclusively established its ratification defense, it has not presented any argument challenging the jury's answers to

38

Questions 13, 14, and 15. For example, Bay Area has not presented a conditional argument that the jury's answer to Question 14—answering "no" when asked whether Bay Area's failure to comply with Section 6.8 was excused—was against the great weight and preponderance of the evidence. Instead, in responding to Bell and Community's second issue concerning breach of Section 6.8, Bay Area stands solely on its argument that it had conclusively established ratification and therefore the trial court properly granted judgment notwithstanding the verdict.

Both the Rules of Civil Procedure and the Rules of Appellate Procedure address this scenario:

> When judgment is rendered non obstante veredicto or notwithstanding the findings of a jury on one or more questions, the appellee may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact, and the ground that the verdict and judgment based thereon should be set aside because of improper argument of counsel.
>
> The failure to bring forward by cross-point such grounds as would vitiate the verdict shall be deemed a waiver thereof . . . .

TEX. R. CIV. P. 324(c); TEX. R. APP. P. 38.2(b). "[T]he thrust of these rules is to require appellees to present any alternative arguments that would prevent the court of appeals from reinstating the jury's verdict should it agree with the appellant that

39

the trial court erred in rendering judgment notwithstanding the verdict." *Dudley Constr., Ltd. v. ACT Pipe & Supply, Inc.*, 545 S.W.3d 532, 540 (Tex. 2018).

Because Bay Area has presented no alternative arguments that would prevent us from reinstating the jury's answers to Questions 13, 14, and 15, Bay Area has waived any such arguments. We therefore need not address Bell and Community's second issue to the extent it argues that sufficient evidence supports the jury's finding that Bay Area failed to comply with Section 6.8.

## C. Sufficiency of Evidence that Welling's, Gibbs', and WGB's Breach of Section 6.8 Was Excused

Bell and Community argue that sufficient evidence exists that Welling, Gibbs, and WGB breached Section 6.8 of the Company Agreement and that their breach caused $925,000 in damages, and they further argue that no evidence supports any of the three excuses for compliance with Section 6.8 that were presented to the jury in Question 14. Welling and Gibbs first argue that the trial court properly entered a take-nothing judgment against Community on its breach of contract claim because the evidence conclusively established that Community agreed to sell its membership interest in WGB for $285,000. Welling and Gibbs—along with WGB—also argue that the trial court's judgment was proper because some evidence supports the jury's finding in Question 14 that their failure to comply with Section 6.8 was excused. We agree with Welling, Gibbs, and WGB that the record contains some evidence to support the jury's answer to Question 14.

40

The doctrine of equitable estoppel requires proof of five elements: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 486 (Tex. 2017) (quoting *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008)). This doctrine "is based on the principle that 'one who by his conduct has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss and injury to the other.'" *Trudy's Tex. Star, Inc. v. City of Austin*, 307 S.W.3d 894, 906 (Tex. App.— Austin 2010, no pet.) (quoting *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.)). Estoppel prevents a party from misleading another party to the other's detriment or to the misleading party's own benefit. *Shields Ltd. P'ship*, 526 S.W.3d at 486 (quotations omitted).

The record contains evidence that after Community and Bay Area signed the PSA, Bell notified Welling and Gibbs—as he was required to do by Section 6.2 of the Company Agreement—that Community intended to sell its membership interest in WGB to Bay Area. Welling and Gibbs insisted that they be allowed to participate in the transfer, and they voted in favor of either WGB exercising its right of first refusal or their exercise of the right of first refusal granted to other WGB members.

41

On February 21, 2019, Bell sent an email to his attorney and Chuck Simmons entitled, in all caps, "Prepayment of Final Proceeds & Option to Exercise to Simmons." In this email, as already discussed above, Bell informed his attorney of an "understanding" he had reached with Chuck Simmons. Chuck Simmons apparently believed "that Welling and Gibbs might become litigious as a stalling tactic in fighting Simmon[s'] purchase of the Bell interest, complicating everything." But Chuck Simmons was apparently "ok with keeping a 25% interest" in WGB through the sale of Park on the Lake—which Simmons and Bell believed could happen within the next six months—and then splitting the sales proceeds four ways to "be done with it."

Bell summarized "the results of [his] conversation" with Chuck Simmons:

- Simmons "will personally and confidentially pay Bell $285,000 now, as a 'prepayment' against the final distribution on the final sale."

- Concurrently with receiving the payment, Bell "will withdraw his sale arrangement from WGB."

- After the sale of Park on the Lake, Bell will receive one-fourth of the sales proceeds and repay the $285,000 to Simmons.

- "Simmons is not requesting any compensation or premium for this generous arrangement to Bell."

- Bell "will give Simmons the right to exercise the purchase of the Bell interest for the $285,000 at any time until the final sale closing out the WGB company."

- Bell agreed to provide "undated but executed" assignment documents to Simmons "to be used, or not, at Simmons['] discretion, to exercise his purchase of the Bell interest."

42

Bell attached an unexecuted indemnity agreement and an unexecuted assignment agreement to his email.

Bell and Chuck Simmons—on behalf of their entities—signed the Termination Agreement and sent a copy of the executed agreement to Welling and Gibbs. Based on the Termination Agreement, Welling believed that Bay Area's effort to purchase Community's membership interest in WGB had come to an end. Days later, however, Chuck and Steve Simmons presented a $285,000 cashier's check drawn on the Trust's account to Bell, and Bell accepted and deposited the check.

Welling and Gibbs did not learn of this arrangement between Bell and the Simmonses until months later, after litigation had ensued in May 2019 and documents—including emails and the $285,000 check—were produced during discovery. Based on this documentation, Welling concluded that Bell had sold Community's interest in WGB to the Trust, noting that none of the documents he had seen referred to a loan. Welling testified that he and Gibbs exercised their contractual rights to obtain a pro rata share of Community's membership interest in WGB, but "then [Bell and Bay Area] rescinded it, and we weren't given the opportunity to participate."

We conclude that this is some evidence the jury could properly consider in answering Question 14 and finding that Welling, Gibbs, and WGB were excused

from their breach of Section 6.8. This is evidence that rather than insisting on strict compliance with the provisions governing disposition of membership interests under Article 6 of the Company Agreement, Bell was willing to proceed entirely outside of that article once Welling and Gibbs expressed their intent to exercise their contractual rights of first refusal. Bell's email explicitly mentioned Welling's and Gibbs' dissatisfaction with the PSA as the reason for formulating a new "understanding" with Chuck Simmons. He characterized the "confidential" $285,000 payment as a "prepayment" against Community's share of the final distribution of proceeds following the sale of Park on the Lake, a prepayment that he would "repay," but he also proposed giving Simmons "the right to exercise the purchase of the Bell interest for the $285,000 at any time until the final sale closing out the WGB company," and he agreed to provide assignment documents that Simmons could use to exercise the purchase at his discretion. Bell and Simmons did not tell Welling and Gibbs about this new "understanding." Instead, they signed the Termination Agreement, notified Welling and Gibbs of that agreement, and then Simmons paid Bell $285,000.

A jury could consider this evidence and conclude that Bell explored the possibility of selling Community's interest in secrecy and outside the parameters of the Company Agreement rather than allow Welling, Gibbs, and WGB the opportunity to exercise their contractual rights of first refusal to purchase

44

Community's interest on the same terms as the PSA or on a pro rata basis. This evidence also could have led the jury to conclude that Welling and Gibbs later learned about Bell's acceptance of the $285,000 cashier's check—a transaction Bell and Community had attempted to conceal—and reached the conclusion that Community had sold its interest in WGB to the Trust. The jury thus reasonably could conclude that Welling and Gibbs were excused from the failure to comply with Section 6.8 of the Company Agreement when they recognized the sale of Community's interest in WGB to the Trust.

The record contains some evidence that (1) Community, through Bell's actions, concealed material facts—the new "understanding" with Chuck Simmons—from Welling, Gibbs, and WGB; (2) Community had knowledge of the facts; (3) Community acted with the intent that Welling, Gibbs, and WGB would rely on the concealment of facts in deciding not to pursue their pro rata share of Community's membership interest in WGB; (4) Welling, Gibbs, and WGB did not know until later and had no means of knowing that Community still planned to transfer its membership interest in WGB either as a sale or through a loan; and (5) Welling, Gibbs, and WGB relied on this concealment to their detriment. *See id.* We conclude that sufficient evidence supports the jury's answer to Question 14, finding that Welling, Gibbs, and WGB's failure to comply with Section 6.8 was excused, and therefore the trial court properly entered a take-nothing judgment

45

against Community on its breach of contract claim against Welling, Gibbs, and WGB.[10]

We overrule Bell and Community's second issue.

## Declaratory Relief

In its third issue, which has several sub-parts, Community argues that the trial court erred by granting declaratory relief to Welling and Gibbs in the final judgment.[11]

Community first argues that the trial court should have disregarded the jury's answer to Question 8—finding that Community breached Section 6.2 of the Company Agreement relating to providing notice of intent to transfer its membership interest—because the jury's answer to Question 4—finding that no enforceable agreement to sell the membership interest existed between Community and the

---

[10] Because we conclude that sufficient evidence supports the jury's answer to Question 14 based on the equitable estoppel excuse, we need not address whether sufficient evidence supports the excuses of waiver or accord and satisfaction. We also need not address Welling and Gibbs' argument that the trial court's take-nothing judgment was proper because the evidence conclusively established that Community agreed to sell its membership interest for $285,000.

[11] To the extent Bell complains about the trial court's declarations and the award of attorney's fees, we note that the trial court stated in the final judgment that "[d]eclaratory judgment is entered in favor of Welling and Gibbs and against Community RV." The five declarations all relate to Community as a member of WGB, not to Bell. Additionally, the trial court ordered only Community, not Bell, to pay attorney's fees. We therefore conclude that Bell lacks standing to challenge the trial court's declarations and attorney's fees award on appeal. *See Gorman v. Gorman*, 966 S.W.2d 858, 866 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (op. on reh'g).

46

Trust—rendered its answer to Question 8 immaterial. It also contends that no evidence supports this finding.

Community further asserts that the trial court erred by making five declarations in favor of Welling and Gibbs. It argues that both the jury's answer to Question 4 and Welling's and Gibbs' decision to join in the August 2020 action recognizing the transfer of Community's membership interest rendered all the declarations moot because no justiciable controversy existed. It also contends that Welling and Gibbs did not plead for the declarations they received.

Finally, it argues that the court erred by awarding attorney's fees to Welling and Gibbs under the Declaratory Judgments Act because the requests for declaratory relief were merely duplicative of Welling's and Gibbs' other claims. It also argues that the court erred by failing to condition the award of appellate attorney's fees to Welling and Gibbs on an unsuccessful appeal by Bell and Community.

## A. Propriety of Declaratory Relief

Following trial, Welling and Gibbs filed a motion for entry of judgment in which they requested that the trial court make five declarations:

1. Community breached Section 6.2 of the Company Agreement;
2. Community waived its right to rescind or void the transfer of its interest in WGB to the Trust;
3. Community's interest in WGB was transferred to the Trust effective August 28, 2020;

4. Welling and Gibbs had a right under Article 6 of the Company Agreement to participate in the transfer on a pro rata basis; and

5. Community has not had an interest in WGB after August 28, 2020.

The court granted all five declarations in its final judgment. The court also ruled that it was equitable and just to award Welling and Gibbs attorney's fees. It awarded—consistent with the jury's answers to Question 20—$165,555 in trial-level attorney's fees and a total of $32,500 in appellate-level attorney's fees. The court did not condition the award of appellate attorney's fees on an unsuccessful appeal by Community.

## 1. Whether sufficient evidence exists that Community breached Section 6.2

Question 8 asked the jury to determine whether Community failed to comply with Section 6.2 of the Company Agreement. That section provides: "Before transferring a Membership Interest, a Member shall first give to the Manager and to all other Members notice of the intent to transfer." The notice "must include a copy of any bona fide written offer to purchase the Membership Interest that the Member has received." The jury answered "yes" to this question.

Community argues that the jury's answer to Question 4 renders its answer to Question 8 immaterial. In Question 4, the jury answered "no" to whether Community agreed to sell its membership interest in WGB to the Trust. Community also argues

that we must disregard the jury's answer to Question 8 because no evidence supports the answer.

A trial court may disregard a jury finding that is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (op. on reh'g); *Orr v. Broussard*, 565 S.W.3d 415, 422 (Tex. App.—Houston [14th Dist.] 2018, no pet.). A jury question is considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995); *see Gilbreath v. Horan*, 682 S.W.3d 454, 528 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (op. on reh'g) ("A question is immaterial when it should not have been submitted to the jury, or when it was properly submitted but has been rendered immaterial by other findings."). Submission of an immaterial issue is not harmful error unless the submission confused or misled the jury. *City of Brownsville*, 897 S.W.2d at 752.

We do not agree that the jury's answer to Question 4 rendered its answer to Question 8 immaterial. Question 4 asked whether Community agreed to sell its membership interest in WGB to the Trust. Question 8 asked whether Community complied with Section 6.2, which requires a member to give the Company's manager and all other members "notice of [its] intent to transfer" its membership interest. A finding that Community did not agree to sell its interest to the Trust does not preclude a finding that Community intended to transfer its membership interest, which

49

triggered Community's contractual duty to give notice under Section 6.2. The lack of an agreement between Community and the Trust does not make the issue whether Community intended to transfer its membership interest—such that it was required to give notice to the other members of WGB—immaterial.

Additionally, we do not agree with Community's argument that the jury's answer to Question 8 was rendered immaterial by Welling's and Gibbs' failure to submit a damages question to the jury. As support for this argument, Community points to the Fourteenth Court of Appeals' statement that "[a] 'none' answer on the damages issue renders the liability issue immaterial." *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 217 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Welling and Gibbs did not seek actual damages for breach of contract at trial, nor did they have to do so to prevail on a claim for declaratory judgment. A finding of actual damages was not a necessary precursor to the ultimate relief awarded to Welling and Gibbs: a declaration that Community breached Section 6.2.

We further disagree that the jury's answer to Question 8 lacks evidentiary support. It is undisputed that after Community and Bay Area signed the PSA, Community—through Bell—provided notice and a copy of the PSA to Welling and Gibbs. At that point in time, Community complied with its obligation under Section 6.2. However, Welling and Gibbs then insisted on their contractual right to participate in the transfer on a pro rata basis. The record contains evidence that Bell

50

and Chuck Simmons developed an alternate plan: they would terminate the PSA, but Simmons would confidentially pay Bell $285,000 as a "prepayment" against Community's final distribution following the sale of Park on the Lake, and Bell would give Simmons "the right to exercise the purchase of the Bell interest for the $285,000 at any time until the final sale closing out the WGB company." Community did not provide notice of its intent to *that* transfer. Indeed, Bell's email to his attorney and Simmons describing this proposal indicates that keeping this transaction secret from Welling and Gibbs was the entire purpose of the new proposed arrangement.

We therefore conclude that Question 8 was not rendered immaterial by Question 4, by Welling's and Gibbs' failure to submit a question on damages, or by a lack of evidentiary support.

### 2. Whether Welling and Gibbs changed positions post-trial and sought declaratory relief that was not supported by their pleadings

Community argues that Welling and Gibbs, in their post-trial motion for entry of judgment, attempted to change their liability claim to argue that Community had breached the Company Agreement by entering an agreement to sell its membership interest to Chuck Simmons and that Community had fraudulently concealed this alleged agreement from Welling and Gibbs. Community argues that this was contrary to Welling's and Gibbs' pleadings, where they alleged an agreement between Community and *the Trust*, an allegation that was rejected by the jury in

Question 4. It also argues that Welling and Gibbs sought leave to amend their pleadings to add requests for five declarations based on their new liability theory, but the trial court did not grant that request.

Welling and Gibbs respond that no material inconsistency exists between their pre- and post-trial liability theories. The jury found—and the trial court declared in the final judgment—that Community breached its contractual obligation under Section 6.2 to provide notice of intent to transfer its membership interest in WGB. They argue that the matter of who Community's agreement to sell was with—whether Chuck Simmons, who then assigned his rights to the Trust, or the Trust directly—is meaningless when determining whether they are entitled to relief. Rather, what matters is that Community intended to sell its interest to *someone*, and it did not inform Welling and Gibbs of this intent, instead allowing them to believe that the contemplated transfer under the PSA would not be finalized after Community informed them that it and Bay Area had terminated the PSA. They argue that the essence of this theory remained consistent throughout the case.

In their live pleading at the time of trial, Welling and Gibbs alleged the following with respect to the proposed sale of Community's interest:

> 31. On the same day Bell improperly wrote a check to Bay Area for $500,000.00 of Company funds, Bell deposited a check for $285,000.00 from the H.S. Simmons Trust, a trust of which Steve Simmons is the trustee, for the purchase of Community RV's membership interest in the Company.

52

. . . .

34. On February 1, 2019, Community RV and Bay Area RV executed a Membership Interest Purchase and Sale Agreement for the sale of Community RV's 25% membership interest in the Company to Bay Area, in consideration of payment to Community RV of $285,000.

35. Article 6 of the Company Agreement, however, gave the Company, Welling, and Gibbs a right of first refusal to participate in any proposed transfer. Upon receiving notice of the proposed Community RV/Bay Area RV transaction, Welling and Gibbs communicated their clear intention to exercise their right and participate in the proposed transfer. Whether Community RV's interest was acquired by the Company itself, or by Welling and Gibbs (along with Bay Area RV), the effect would be the same: Welling and Gibbs would each pay one third of the consideration and would receive one third of Community RV's interest. Following the transaction, Welling and Gibbs would own two thirds of the Company and Bay Area RV would own one third.

36. Upon realizing that Welling and Gibbs would exercise their rights under the Company Agreement, Bell and the Simmonses decided to terminate their February 1 agreement. Bell and the Simmonses then decided to conceal their agreement to transfer Community RV's interest in an attempt to avoid the right of first refusal provisions, notwithstanding Community RV's duty under Section 6.2 of the Company Agreement to notify Welling and Gibbs.

Welling and Gibbs asserted a fraud claim and alleged that after they informed Community and Bay Area that they wished to participate in the transfer of Community's interest, "Bell and the Simmonses then conspired to defeat Welling and Gibbs's plain contractual right by purporting to terminate their agreement [the PSA]. The conspirators failed to disclose their plan to go ahead with their deal

53

anyway, with the intent that Welling and Gibbs would rely on their intentional misrepresentations and failures to disclose material facts."

Welling and Gibbs also asserted a breach of contract claim against Community and Bay Area, alleging breach of Article 6 "by failing to give notice of Community RV's intent to transfer its interest to Steven Simmons, As Trustee for the H.S. Simmons Trust, intending to avoid Welling and Gibbs's right of first refusal." As a remedy for this breach, they sought "specific performance of the Company Agreement through a declaratory judgment that they are entitled [to] each acquire at least one third, and up to half, of the interest Community RV agreed to be transferred to the H.S. Simmons Trust." They further alleged that Community had a duty to disclose its intent to transfer its interest to the Trust, failed to do so, and conspired with Bay Area, Chuck Simmons, and Steve Simmons "to defraud Welling and Gibbs and to obtain the benefit of their hidden transaction." The parties allegedly "conspired to create a false impression that the Community/Bay Area [PSA] transaction had been terminated, when in fact the conspirators simply went ahead with the transaction anyway and decided how to paper their deal up later, if at all." Welling and Gibbs alleged that this conduct justified imposition of a constructive trust in their favor on at least two thirds, or up to all, of Community's membership interest.

Welling and Gibbs thus alleged that Community—along with Bay Area, Chuck Simmons, Steve Simmons, and the Trust—fraudulently concealed the true nature of their dealings with respect to Community's membership interest. They may have been mistaken about the existence of a direct agreement between Community and the Trust—as the jury found in Question 4—but they clearly alleged that Community had breached the Company Agreement by failing to provide them notice of intent to transfer its membership interest in WGB. We conclude that the liability theory asserted in Welling's and Gibbs's post-trial motion for entry of judgment was consistent with their pleadings.

### 3. Whether the trial court properly entered declarations in the final judgment

Community argues that none of the trial court's five declarations were proper, and it attacks each declaration on multiple grounds. These arguments include: (1) the jury's answer to Question 4 means that no justiciable controversy exists regarding any of the declarations; (2) Welling's and Gibbs's actions in approving the August 2020 writing that recognized the transfer of Community's interest mooted their requested declarations; (3) Welling and Gibbs did not properly plead for the declarations; (4) no evidence supports the declaration relating to Community's breach of Section 6.2; (5) Community did not seek at trial to void or rescind the transfer of its membership interest, and no law prohibits it from electing to sue for breach of contract and seeking damages; and (6) the jury found that transfer of

Community's interest was unauthorized and there was no agreement to sell the interest to the Trust, and therefore Welling and Gibbs had no right to participate in such an alleged transfer.

We have already discussed Community's arguments concerning the first declaration—that Community breached Section 6.2—and concluded that the jury's finding on which this declaration was based was material and supported by sufficient evidence. With respect to the remaining declarations, Community advances no arguments for why the trial court's entry of these declarations has any impact on its rights, prejudices it, or otherwise constitutes reversible error.

In the order granting judgment notwithstanding the verdict in favor of Bay Area, Chuck Simmons, Steve Simmons, and the Trust, the trial court ordered that Bell and Community "shall take nothing in this case." When the trial court signed its final judgment, the court did not award actual damages to any party. Instead, the court made the five declarations, awarded Welling and Gibbs attorney's fees under the Declaratory Judgments Act in the amounts found by the jury, awarded post-judgment interest on those amounts, and taxed costs against Bell and Community. The declarations do not require Bell or Community to take any action of any kind.

Even considering our holding on appeal that the jury's verdict on Questions 13, 14, and 15 should be reinstated with respect to Bay Area, none of the five declarations entered by the trial court have any effect on those three jury findings.

Declaring that Community waived its right to rescind or void the transfer of its interest to the Trust will not impact the newly reinstated jury finding that Bay Area must pay Community $925,000 in damages for breaching Section 6.8. Nor will the reinstated findings impact the trial court's declarations that Community's interest was transferred to the Trust effective August 28, 2020, that Welling and Gibbs had a contractual right to participate in that transfer on a pro rata basis, and that Community has not had an interest in WGB since August 28, 2020. Community will not regain its interest in WGB, but it did not seek this relief in its live pleading. It sought actual damages. Due to our reversal of the trial court's judgment notwithstanding the verdict based on ratification, Community will receive actual damages for the loss of its membership interest.

We conclude that the trial court did not commit reversible error by making the five declarations included in the final judgment.

## B.    Attorney's Fees Under the Declaratory Judgments Act

Community also argues that the trial court erred by awarding attorney's fees to Welling and Gibbs under the Declaratory Judgments Act, primarily arguing that Welling and Gibbs improperly sought declaratory relief solely to obtain otherwise impermissible attorney's fees. We disagree.

The trial court may award costs and "reasonable and necessary attorney's fees as are equitable and just" in any proceeding under the Declaratory Judgments Act.

TEX. CIV. PRAC. & REM. CODE § 37.009. The "reasonable and necessary" requirements are questions of fact to be determined by the factfinder, while the "equitable and just" requirements are questions of law for the trial court. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 311 (Tex. 2006).

Unlike other statutes, the Declaratory Judgments Act does not contain language that limits an award of attorney's fees to a "prevailing party." *See Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996) ("[T]he award of attorney's fees in declaratory judgment actions is clearly within the trial court's discretion and is not dependent on a finding that a party 'substantially prevailed.'"). The trial court has discretion to decline to award attorney's fees to any party, and the court has discretion to award attorney's fees to a nonprevailing party. *See Approach Res. I, L.P. v. Clayton*, 360 S.W.3d 632, 639 (Tex. App.—El Paso 2012, no pet.); *Severs v. Mira Vista Homeowners Ass'n*, 559 S.W.3d 684, 712 (Tex. App.—Fort Worth 2018, pet. denied). Indeed, the language of the Declaratory Judgments Act does not require the trial court to consider or render judgment on the merits of the declaratory relief claim in order to award attorney's fees, so long as the proceeding was brought under the Act. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020). We review a trial court's award of attorney's fees under the Declaratory Judgments Act for an abuse of discretion. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004).

A party may not use the Declaratory Judgments Act "as a vehicle to obtain otherwise impermissible attorney's fees." *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). "When a claim for declaratory relief is merely 'tacked onto' statutory or common-law claims that do not permit fees, allowing the [Act] to serve as a basis for fees 'would violate the rule that specific provisions should prevail over general ones.'" *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (per curiam) (quoting *MBM Fin. Corp.*, 292 S.W.3d at 670). The declaratory judgment claim "must do more 'than merely duplicate the issues litigated' via the contract or tort claims." *Id.* (quoting *MBM Fin. Corp.*, 292 S.W.3d at 670).

We conclude that Welling and Gibbs meet that threshold. Welling and Gibbs have asserted claims for declaratory relief since their first filing in this proceeding. They initially sought a declaration relating to Section 5.1 of the Company Agreement, an issue that was ultimately resolved in our first decision in this case. Any person interested under a written contract whose rights, status, or other legal relations are affected by a contract "may have determined any question of construction or validity arising under" the contract "and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE § 37.004(a).

Welling and Gibbs later amended their petition to seek the declaratory relief described above: "specific performance of the Company Agreement through a declaratory judgment that they are entitled [to] each acquire at least one third, and up to half, of the interest Community RV agreed to be transferred to the H.S. Simmons Trust." This is the remedy that Welling and Gibbs sought for their claim for breach of Article 6 of the Company Agreement rather than actual damages, as they were entitled to do. *See MBM Fin. Corp.*, 292 S.W.3d at 669 ("But prohibiting declaratory judgments whenever a breach of contract claim is available would negate the Act's explicit terms covering such claims.").

Ultimately, Welling and Gibbs did not obtain the declaration that they sought in their amended pleading. Instead, after obtaining a jury finding that Community breached the Company Agreement, they obtained five different declarations. We cannot conclude, however, that Welling and Gibbs brought their declaratory relief claims "as a vehicle to obtain otherwise impermissible attorney's fees." *See MBM Fin. Corp.*, 292 S.W.3d at 669.

Moreover, even if they had, they were not the only parties who sought declaratory relief. Up until October 2021, two months before trial, Bell and Community also sought declarations.

In October 2020, Bell and Community filed a pleading that combined Bell's fourth amended counter and cross claims and Community's second amended counter

60

and cross claims. They requested declarations that Bell "did not sell Community's interest in WGB by cashing the check, instead he received a loan from Charles Simmons for $285,000 and that Community is still a member of WGB."[12] Their next amended pleading (filed in October 2021) and their live pleading (filed in November 2021) did not contain these requests for declaratory relief. Instead, Bell and Community continued to allege that the transfer of Community's membership interest and the recognition of that transfer was wrongful, and they continued to seek actual damages under several theories, most notably breach of contract, fraud, and conversion.

By the time Bell and Community amended their pleadings to drop their claims for declaratory relief, trial was imminent. All parties—including Welling and Gibbs—had been preparing for trial under the belief that multiple claims for declaratory relief brought by different parties would be litigated. Bell and Community ultimately decided not to pursue their declaratory claims at trial, as was their right. However, as the Texas Supreme Court has recognized, the Declaratory Judgments Act "authorizes courts to award equitable and just fees in *any proceeding* under the Act; it does not require the trial court to consider or render judgment on the merits of that claim." *See Yowell*, 620 S.W.3d at 355; *Castro v. McNabb*, 319

---

[12]    Community requested substantively identical declarations: "that Community did not sell its interest in WGB by Bell's cashing of the March 1, 2019 cashier's check and that Community is still a member of WGB."

S.W.3d 721, 735 (Tex. App.—El Paso 2009, no pet.) ("The [Declaratory Judgments Act] does not require a judgment on the merits of the dispute as a prerequisite to a fee award."). This was a proceeding under the Declaratory Judgments Act. We conclude that the trial court did not abuse its discretion in determining that the award of attorney's fees in favor of Welling and Gibbs, as found by the jury, was equitable and just.

Community also argues that the trial court erred by failing to condition the award of appellate attorney's fees on an unsuccessful appeal. We agree.

A trial court may not penalize a party for taking a successful appeal. *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The trial court must condition the award of appellate attorney's fees upon the appellant's unsuccessful appeal, and an unconditional award of appellate attorney's fees is improper. *Id.* But an unconditional award of appellate attorney's fees does not require reversal. *Id.* Instead, we may modify the judgment to make the award of appellate attorney's fees contingent upon the receiving party's success on appeal. *Id.*

In its final judgment, the trial court awarded Welling and Gibbs $165,555 in trial-level attorney's fees and a total of $32,500 in appellate-level attorney's fees from Community. The trial court did not condition the award of appellate-level attorney's fees on Community's unsuccessful appeal. This was error. We therefore modify the judgment of the trial court to make the award of appellate attorney's fees

contingent on Community's lack of success on appeal. *See id.*; *see also Sky View at Las Palmas, LLC v. Mendez,* 555 S.W.3d 101, 116 (Tex. 2018) ("[B]ecause an award of appellate attorney's fees depends on the outcome of the appeal, it is not a final award until the appeal is concluded and the appellate court issues its final judgment.") (quotations omitted).

We sustain Bell and Community's third issue in part.

## Conversion

Finally, in their fourth issue, Bell and Community argue that the trial court erred by granting a directed verdict on their conversion claim because, in their view, Texas law allows a person to maintain a conversion action for a membership interest in a limited liability company.

### A.    Standard of Review

We review a trial court's ruling granting a directed verdict de novo. *City of Baytown v. Schrock*, 645 S.W.3d 174, 178 (Tex. 2022). We use the same legal sufficiency standard as we apply to no-evidence summary judgments. *Id.* A trial court properly grants a directed verdict when no evidence supports a vital fact or the evidence fails to state a claim as a matter of law. *Id.* We view the evidence in a light favorable to the party suffering an adverse judgment, crediting all reasonable inferences and disregarding contrary evidence and inferences. *Id.* We must decide whether there is any evidence of probative value to raise a material fact issue on the

question presented. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011) (op. on reh'g).

**B.     Whether Texas Law Recognizes a Claim for Conversion of an LLC Membership Interest**

Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 684 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To recover on a claim for conversion, the plaintiff must establish that (1) it owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Id.* The plaintiff must also prove damages that are the proximate result of the defendant's conversion. *Id.* at 685. Typically, the measure of damages is the fair market value of the property at the time and place of the conversion. *Id.* (quotations omitted).

The threshold question in this issue—and the question that the parties dispute—is whether a membership interest in a limited liability company is the kind of property that can be converted. Generally, a plaintiff may only maintain a conversion action for tangible personal property. *Robin Singh Educ. Servs., Inc. v. Test Masters Educ. Servs., Inc.*, 401 S.W.3d 95. 97 (Tex. App.—Houston [14th

64

Dist.] 2011, no pet.). Texas courts have, however, recognized an exception to this general rule—the "merger exception"—when an underlying intangible right has been merged into a physical document and that document has been converted. *See Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982) (per curiam) ("The conversion of the document in which the rights had been merged supports a conversion action for the value of the rights represented by it."); *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.) ("Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted.").

In arguing that its membership interest in WGB was subject to conversion, Community points to cases in which Texas courts have allowed a conversion claim for ownership interests in a corporation. For example, in *Rio Grande Cattle Co. v. Burns*, 17 S.W. 1043, 1046 (Tex. 1891), the Texas Supreme Court determined that the corporation's failure to transfer stock from the original shareholder to an assignee and failure to issue certificates for the stock or otherwise recognize the assignee's ownership rights in the corporation "amount to a conversion under the law." Similarly, an executor of an estate may maintain a conversion action for the wrongful refusal to issue certificates of stock to which the decedent had been entitled. *See Bower v. Yellow Cab Co.*, 13 S.W.2d 708, 710 (Tex. App.—El Paso 1929, writ

65

ref'd); *see also Watts v. Miles*, 597 S.W.2d 386, 387 (Tex. App.—San Antonio 1980, no writ) (concluding that fact issue existed on conversion claim when evidence reflected that defendant refused to transfer ownership of corporate shares of stock).

Community argues that no Texas state court cases have addressed whether an LLC membership interest is personal property that can be subject to a conversion claim. It argues that, instead, only the Eastern District of Texas has done so.[13] In *Higher Perpetual Energy, LLC v. Higher Power Energy, LLC*, one of the questions that arose on a Rule 12(b)(6) motion was whether the plaintiff had stated a claim for relief for conversion. *See* No. 4:17-CV-00414, 2018 WL 3020328, at *4 (E.D. Tex. June 18, 2018). The case involved an agreement to develop a series of wind farm projects, and an LLC was formed to facilitate development of the projects. *Id.* at *1. The plaintiff alleged that the defendant had conveyed to it a 30% membership interest in the LLC, but the defendant converted the property by selling the interest without the plaintiff's consent and without proper compensation. *Id.* at *4. With no analysis, the federal district court ruled that, viewing the allegations as true, the plaintiff "sufficiently pleaded a claim for a conversion." *Id.*

---

[13] Community also cites caselaw from the Delaware Chancery Court holding that a membership interest in an LLC can be converted. *See Bamford v. Penfold, L.P.*, C.A. No. 2019-0005-JTL, 2020 WL 967942, at *22–23 (Del. Ch. Feb. 28, 2020); *Perry v. Neupert*, C.A. No. 2017-0290-JTL, 2019 WL 719000, at *24–25 (Del. Ch. Feb. 15, 2019).

The conversion defendants—Welling, Gibbs, WGB, Bay Area, Chuck Simmons, Steve Simmons, and the Trust—assert two primary arguments in support of the trial court's directed verdict and ruling that an LLC membership interest cannot be converted. They first argue that the "merger exception" does not apply to this case because membership interests in LLCs like WGB—unlike shares in for-profit corporations—are uncertificated by default unless the company agreement provides otherwise, and the Company Agreement in this case says nothing about requiring certificates to reflect a member's membership interest. There is, therefore, no physical, tangible document that has been converted in this case, unlike in *Rio Grande Cattle*, *Bower*, and *Watts*. Second, they argue that, essentially, Community's claim is one for breach of contract—the Company Agreement—and allowing Community to pursue tort remedies through a conversion claim would run afoul of the economic loss rule. We address the conversion defendants' second argument first.

### 1. Effect of the economic loss rule

The "economic loss rule" is a collection of rules that govern the recovery of economic losses in certain areas of the law. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) (quotations omitted); *W. Loop Hosp., LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 485 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). Generally, this rule precludes recovery in tort

67

for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy. *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam); *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 365 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (op. on reh'g) ("[O]ne general formulation of the economic loss rule, as applicable to this case, is that a party may not recover in tort for purely economic losses suffered to the subject matter of a contract."). The rule does not, however, bar all tort claims that arise out of a contractual setting. *Chapman Custom Homes*, 445 S.W.3d at 718.

A party's actions may breach duties in tort, contract, or both simultaneously. *Jim Walter Homes, Inc v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *W. Loop Hosp.*, 649 S.W.3d at 485. A claim sounds in contract when the only injury is economic loss to the subject of the contract itself. *½ Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 387 (Tex. 2011). A claim sounds in tort when the alleged duty breached is independent of the contract and the harm suffered is not merely the economic loss of a contractual benefit. *Chapman Custom Homes*, 445 S.W.3d at 718. In explaining this distinction, the Texas Supreme Court has stated:

> Tort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others. If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort.

> Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (quotation omitted).[14]

Several of our sister intermediate appellate courts have addressed whether a plaintiff can recover for an injury under contract law or under conversion law. In *Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, the parties signed a contract in which Kinder Morgan agreed to process Exxon Mobil's natural gas, extract liquid and liquefiable hydrocarbons such as propane, and provide the extracted hydrocarbons to Exxon Mobil. 192 S.W.3d 120, 123 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The contract contained provisions requiring Kinder Morgan to perform certain activities to ensure that the remaining natural gas "leaving the plant would contain an average of no less than 950 BTUs per cubic foot," so to account for this, the percentage of propane allotted to Exxon Mobil "was expressly made variable" under the contract, and a later amendment set the amount at a fixed

---

[14] This issue presents an example of what the University of Texas Law School's renowned tort scholar, Bill Powers, referred to as "border wars." *See* William Powers, Jr., *Border Wars*, 72 TEX. L. REV. 1209 (1994); *see also* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 TEX. TECH L. REV. 477 (1992). Dean Powers used the phrase "border wars" to describe the clash between bodies of law with distinct paradigms and differing policy concerns, such as the classic subjects taught in the first year of law school: property, contract, tort, and criminal law. *See* Powers, 72 TEX. L. REV. at 1209–10.

percentage. *Id.* After the parties performed under the contract for more than a decade, Exxon Mobil sued and asserted a conversion claim, alleging that Kinder Morgan appropriated quantities of propane that should have been provided to Exxon Mobil but were instead sold to third parties for a profit. *Id.* at 124.

On appeal, the Fourteenth Court of Appeals upheld the trial court's directed verdict against Exxon Mobil's conversion claim, noting that when the only loss or damage is to the subject matter of the contract, a plaintiff's action "is ordinarily on the contract." *Id.* at 127 (citing *DeLanney*, 809 S.W.2d at 494–95). The court also stated that when a contract "spells out the parties' respective rights about a subject matter, the contract—not common law tort theories—governs any dispute about the subject matter." *Id.* The court reasoned that "Exxon Mobil essentially argues that the manner in which [Kinder Morgan] performed [its] obligations under the contract converted one of the very products that the contract was entered into to produce (or extract). In essence, Exxon Mobil claims that it did not receive all the propane that it was entitled to under the [contract]." *Id.* at 127–28. The only loss that Exxon Mobil complained of was the propane—the subject of the contract—and the contract "spells out the parties' respective rights regarding the processing of the propane." *Id.* at 128. Because the nature of the dispute was whether Kinder Morgan performed its contractual obligations, Exxon Mobil's claim sounded in contract law, not conversion law. *Id.*

The Tyler Court of Appeals reached a similar conclusion in a case involving whether plaintiffs could sue for conversion of their share of natural gas and gas condensate production when a joint operating agreement governed dealings between the parties. *See Castle Tex. Prod. Ltd. P'ship v. Long Trs.*, 134 S.W.3d 267, 272, 273–75 (Tex. App.—Tyler 2003, pet. denied). In concluding that the plaintiffs did not have a viable conversion claim, the Tyler Court noted that the contracts "state[d] explicitly and in great detail the rights and duties of the parties with reference to the gas and gas condensate production and gas balancing," and the contracts contained "express provisions that deal with the circumstances of this case." *Id.* at 275. It reasoned that if a party must prove the contents of its contract and relies on the duties created in the contract, "the action is in substance an action on the contract." *Id.* (quoting *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 869 (Tex. App.—San Antonio 1997, no writ)). Because the plaintiffs' loss "was entirely economic loss to the subject matter of the contracts," the plaintiffs could not recover under a conversion theory.[15] *Id.*

---

[15]  Both the Corpus Christi Court of Appeals and the Waco Court of Appeals have followed similar reasoning in concluding that a plaintiff's conversion claim actually sounds in contract. *See ConocoPhillips Co. v. Koopmann*, 542 S.W.3d 643, 664–67 (Tex. App.—Corpus Christi–Edinburg 2016) (concluding that because claim for unpaid royalties was governed entirely by lease agreement between parties, plaintiff could not maintain conversion claim), *aff'd on other grounds*, 547 S.W.3d 858 (Tex. 2018); *Dhanani v. Giles*, No. 10-07-00144-CV, 2008 WL 2210004, at *4 (Tex. App.—Waco May 28, 2008, pet. denied) (mem. op.) (concluding that conversion claim "sounds in contract alone" when plaintiff's allegations "amount to nothing more than a complaint" that defendants failed to comply with parties' agreement).

More recently, the Fourteenth Court of Appeals has addressed the issue present in this case: whether a party's membership interest in an LLC can be the subject of a conversion claim or whether the dispute is properly decided under contract law. *See Houston Metro Ortho & Spine Surgery, LLC v. Juansrich, Ltd.*, No. 14-19-00732-CV, 2021 WL 2799643, at *5 (Tex. App.—Houston [14th Dist.] July 6, 2021, pet. denied) (mem. op.). In holding that the conversion claim was not viable, the Fourteenth Court relied heavily on its earlier decision in *Exxon Mobil*. *Id.* It also relied upon the Texas Supreme Court's opinion in *Chapman Custom Homes*, particularly the court's statements that (1) the economic loss rule typically precludes tort recovery for economic losses resulting from a failure to perform under the contract when the harm consists only of the economic loss of a contractual expectancy; (2) the economic loss rule does not bar all tort claims arising out of a contractual setting; and (3) a party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm is not merely

The Fifth Circuit has done likewise in a case applying Texas law. *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 726 (5th Cir. 2015) ("Had U.S. Auto calculated the commission and transferred the policies as required by the contracts, the factual predicate for a conversion claim would collapse.").

By contrast, the El Paso Court of Appeals has held that a plaintiff can maintain a conversion claim even when a joint operating agreement governs the parties' relationship. *See Cass v. Stephens*, 156 S.W.3d 38, 69 (Tex. App.—El Paso 2004, pet. denied). In that case, the defendants unlawfully appropriated jointly owned equipment to benefit their solely owned wells. *Id.* The El Paso Court concluded that the defendants' actions "breached an obligation that exists independent of the JOAs" and "had nothing to do with the JOAs." *Id.*

the economic loss of a contractual benefit. *Id.* (quoting *Chapman Custom Homes*, 445 S.W.3d at 718).

The Fourteenth Court then concluded:

> Here, we are presented with the former situation rather than the latter. The LLC Agreement covers the field of this dispute. It created Juansrich's ownership interest, defined the parties' rights and duties under the agreement, and established the remedies available when a party failed to perform those duties. In addition, Juansrich's alleged loss is the receipt of a contractual benefit, reimbursement for the loss of its ownership interest in Metro. As a result, Juansrich's conversion claim fails as a matter of law.

*Id.*

When taking into consideration decades of precedent on the economic loss rule, the caselaw applying those principles to conversion claims (such as *Exxon Mobil*), the caselaw holding that intangible property cannot be subject to a conversion claim, and the Fourteenth Court's decision in *Houston Metro*, we conclude that under the present circumstances, Community cannot maintain a conversion claim. Community, Welling, Gibbs, and Bay Area negotiated the Company Agreement. That agreement governs all aspects of their relationship, including membership rights and procedures to follow when transferring a membership interest and recognizing such a transfer. *See* TEX. BUS. ORGS. CODE § 101.052(a) (providing that LLC's company agreement governs relations among members, managers, officers, assignees of membership interests, and company itself, as well as company's other internal affairs); *see also Exxon Mobil*, 192 S.W.3d

73

at 128 (concluding that conversion claim was not viable in part because parties' contract "spells out" parties' respective rights). Rather than sounding in tort, Community's claim is, in essence, a breach of contract claim, and it should be governed by that body of law.

### 2. Application of the "merger exception"

In arguing that it properly asserted a conversion claim, Community relies on the "merger exception" to the general rule that intangible property cannot be converted. We disagree that the exception is applicable to this case.

First, the cases cited by Community as supporting authority involved the defendants' refusal to issue physical share certificates. For example, in *Rio Grande Cattle Co.*, after the plaintiff acquired a shareholder's interest in the corporation, he requested that the corporation transfer the stock on the company's books and issue certificates for the amount of stock, but the corporation refused. *See* 17 S.W. at 1046. The Texas Supreme Court held that it was "well settled" that the corporation's actions "amount to a conversion under the law." *Id.* Similarly, *Bower* involved the "wrongful refusal to issue certificates of stock to which plaintiff was entitled." *See* 13 S.W.2d at 710. This case, however, does not involve such a refusal.

Second, Community's cited authorities all involve corporations, while this case involves a limited liability company. This distinction matters. The governing documents of a corporation are its certificate of formation and its bylaws. *See* TEX.

74

BUS. ORGS. CODE §§ 3.005 (certificate of formation), 21.052 (amendments to certificate of formation), 21.057 (bylaws). Although a corporation's shareholders may enter into a shareholder agreement, they are not required to do so, so a contract is not necessary to govern a corporation's affairs. *See id.* § 21.101(a). A limited liability company, on the other hand, is governed by its company agreement. *See id.* §§ 101.052(a) (providing that company agreement governs, among other things, relations between members and company and company's internal affairs), 101.054 (providing that some provisions of Business Organizations Code Chapter 101— relating to LLCs—can be waived or modified in the company agreement, but others cannot); *see also Abdullatif v. Choudhri*, 561 S.W.3d 590, 609–10 (Tex. App.— Houston [14th Dist.] 2018, pet. denied) (applying general rules of contract construction when interpreting company agreement).

Additionally, unlike ownership interests in for-profit corporations, ownership interests in limited liability companies are presumptively uncertificated: "Ownership interests in a domestic entity, other than a domestic entity described by Subsection (b) [for-profit corporations, real estate investment trusts, and professional corporations], are uncertificated unless this code or the governing documents of the domestic entity state that the interests are certificated." TEX. BUS. ORGS. CODE § 3.201(c). The Company Agreement does not contain a provision stating that its membership interests are certificated.

We thus conclude that this case does not fall within the "merger exception" to the general rule that a conversion claim will not lie for intangible property. We hold that the trial court did not err by granting a directed verdict on Community's conversion claim.

We overrule Community's fourth issue.

## Conclusion

The trial court erred in disregarding the jury's answer to Question 15. We therefore reverse the trial court's order granting judgment notwithstanding the verdict and remand the case to the trial court for further proceedings consistent with this opinion and for entry of proper judgment as between Community and Bay Area. We modify the portion of the trial court's judgment awarding appellate attorney's fees to Welling and Gibbs to make payment of these fees contingent on Community's unsuccessful appeal. We affirm the remainder of the trial court's judgment.

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Rivas-Molloy and Gunn.